WILLIAM JAY SCHIEFFELIN, Respondent, *v.* JOHN F. HYLAN
and Others, Appellants.

Second Department, June 6, 1919.

**Municipal corporations — city of New York — taxpayer's action to
restrain city from issuing corporate stock — Rapid Transit Act —
expenses of Public Service Commission chargeable to cost of
construction of subway — injunction pendente lite.**

In a taxpayer's action brought to enjoin the city of New York from issuing
corporate stock of said city, pursuant to a resolution passed by its board
of estimate and apportionment, a portion of the proceeds of which stock
was to be applied to the redemption of special revenue bonds already issued
for the purpose of providing funds to meet the expenses of the Public
Service Commission under subway construction contracts, and the balance
to be paid into " the general fund for the reduction of taxation " to reim-
burse the same for the said part of the said expenses which have hereto-
fore been paid by taxation, that is, through the issue of special revenue
bonds and the payment and retirement thereof, provisions of section 10
of the Rapid Transit Act, both prior to and after the amendment by
chapter 226 of the Laws of 1912, examined and.

*Held,* that an order granting plaintiff's motion for an injunction *pendente
lite* should be affirmed.

PUTNAM and KELLY, JJ., concurred, with opinion, in the result, on the ground
that the Public Service Commission had not made a determination of the
amount of its expenses chargeable to the cost of construction; JENKS,
P. J., and BLACKMAR, J., dissented, with opinions.

APPEAL by the defendants, John F. Hylan and others,
from an order of the Supreme Court, made at the Kings
County Special Term and entered in the office of the clerk of
the county of Kings on the 26th day of February, 1919,
granting plaintiff's motion for an injunction *pendente lite*.

*Terence Farley* [*William P. Burr, Corporation Counsel,* and
*John Lehman* with him on the brief], for the appellants.

*Leonard M. Wallstein,* for the respondent.

MILLS, J.:

The action is a taxpayer's, brought to enjoin the appropriate
city authorities of New York city from issuing corporate
stock of said city to the amount of $4,500,000 pursuant to a
resolution passed by its board of estimate and apportionment

on February 7, 1919. (See Gen. Mun. Law [Consol. Laws, chap. 24; Laws of 1909, chap. 29], § 51; Code Civ. Proc. § 1925.) The order appealed from granted an injunction *pendente lite* to that effect.

In granting the motion the justice at Special Term filed an opinion, which states and reviews at length the material law and facts; and, as I find his statements thereof to be accurate and agree with his conclusions, I shall not attempt any very detailed statement of the reasoning here. (106 Misc. Rep. 347.)

The resolution consists of a long preamble reciting the premises upon which the board assumed to act, and of a resolving part which is comparatively brief. The preamble may be thus summarized:

Chapter 226 of the Laws of 1912 amended section 10 of the Rapid Transit Act (Laws of 1891, chap. 4) by adding thereto a provision to the effect that if the Public Service Commission shall determine that a part of its expenses shall be included in determining the cost of construction of a railroad constructed under the act, then the said board, upon the requisition of the Commission, may appropriate such sum as may be requisite for such part of the expenses of the Commission and authorize the issue of corporate stock of the city for such purpose; and that the comptroller shall thereupon issue and sell such stock for that purpose. Rapid transit contracts Nos. 3 and 4 were authorized by the said board on the 18th of March, 1913, after said amendment went into effect, and provided that the cost of construction should include such expenses. From time to time since that date the Public Service Commission has made requisition upon said board for such part of its expenses; and the expenditures of the city for such expenses during the years 1915, 1916, 1917 and 1918 up to February 4, 1919, have aggregated the sum of $12,567,150.82. That Commission has furnished to the board estimates of its expenses " chargeable to the costs of construction " for the years 1915, 1916 and 1917 amounting to $4,800,000 on contract No. 3 and $3,700,000 on contract No. 4, making an aggregate upon the two of $8,500,000; and their said expenses under said

contracts for the rest of the period, including 1918, are not yet determined.  Therefore, on account of all of such expenses, at least $4,500,000 should be covered into the city treasury " by issue of rapid transit corporate stock, to be divided two million five hundred thousand dollars ($2,500,000) against contract No. 3, and two million dollars ($2,000,000) against contract No. 4."  The resolution then proceeds to authorize and direct such issue of corporate stock to the amount of $4,500,000, and that of the proceeds thereof $1,000,000 shall be applied to the redemption of special revenue bonds already issued for the purpose of providing funds to meet those expenses, and the balance of $3,500,000 shall be paid into "the General Fund for the Reduction of Taxation " to reimburse the same for the said part of the said expenses which have heretofore been paid by taxation, that is, through the issue of such bonds and the payment and retirement thereof.

It appears also that during all those years the such expenses of the Commission have in fact been met year by year by the issue by said board of special revenue bonds under said section 10 of the Rapid Transit Act, as amended by said chapter 226 of the Laws of 1912.  The gist of the former provision, that is, before the amendment, as related to the matter in hand, was that the board should from time to time, upon requisition of the Commission, appropriate the necessary sums to pay the expenses of the Commission (the same to be paid out upon due vouchers and auditing), and that the funds for that purpose should be provided by the issue and sale of revenue bonds of the city " in anticipation of receipt of taxes;" and that the amount necessary to pay the bonds, principal and interest, should be included in the next year's tax levy.  (See Laws of 1909, chap. 498, amdg. said § 10.) The scheme here was plain, to pay those expenses at once, or at least after one year, by general taxation; while another section of the act, section 37, provided that the construction cost of the work should be paid by the issue of corporate stock of the city.  (See Rapid Transit Act, § 37, added by Laws of 1894, chap. 752, as amd. by Laws of 1911, chap. 888;* Greater N. Y. Charter [Laws of 1901, chap. 466], § 169, as amd.

---

* Since amd. by Laws of 1913, chap. 540; Laws of 1915, chaps. 544, 545, and Laws of 1917, chap. 625.— [REP.

by Laws of 1911, chap. 456.\*)  The amendment of section 10 by the act of 1912 added thereto the following distinct provision, viz.: " If the said Commission shall determine that part of its expenses shall be included in determining the cost of construction of a railroad constructed under sections twenty-six, twenty-seven, twenty-nine or thirty-three of this act, then and in that event the said board of estimate and apportionment or other board or public body upon the requisition of the Commission duly made may appropriate such sum or sums of money as may be requisite and necessary for such part of its expenses *and authorize the issue of corporate stock for such purposes,* and it shall thereupon become the duty of the comptroller of said city to issue and sell corporate stock of the city for such purposes."

The first question in controversy between the parties here is as to the construction of the amended section 10.  The appellants claim that its meaning is that the board must issue corporate stock to pay the expenses of the Commission; that, in other words, the amendment leaves the former (still retained) part of the section, directing the issue and sale of revenue bonds to defray the expenses of the Commission, applicable only to that part of the expenses which is not included in the cost of construction as determined by the Commission.  Indeed upon that view the issue of revenue bonds to pay the expenses so included in those costs after the amendment would be entirely unauthorized and illegal.  Upon the other hand, the claim of the respondent is that the amendment left it to the choice of that board which method it should pursue in order to raise the necessary funds, whether by the issue of revenue bonds, which would apply the " pay-as-you-go " policy, or by the issue of corporate stock which would not be paid off and retired until the end of fifty years.  The learned justice at Special Term sustained the latter view and contention, and I agree with his reasoning and conclusion in that regard.

The appellants further claim that, inasmuch as those bonds in the years in question were issued illegally, the board can

---

\* Since amd. by Laws of 1915, chap. 309, and Laws of 1916, chap. 615. — [REP.

now issue corporate stock for the amounts they represented, even as to those bonds issued in years prior to 1918, which have already been paid off and retired out of the taxes as required by law. Of course, if the conclusion just above reached, that the amended section gave to the board the option to raise the requisite funds by issuing either class of securities be correct, then it is immaterial even if the latter contention of appellants be correct, because in that view the premise upon which it is based fails. It seems to me, however, that such contention is not well made. The money to pay those bonds has been raised by taxation and actually applied to that purpose. If this reasoning of the appellants be sound, then it would be competent for the board to look over the city records for any length of time, even fifty years, and if it could find therein that any sum of money in any form had been included in any tax levy to pay the purported obligations of the city illegally issued, it would be competent for the board to issue the city's obligations to raise the money represented by those payments in order to reimburse the taxpayers of the city, albeit at the expense of its taxpayers fifty years hence. If it be true that the city, out of its general taxation, has paid a debt which it should have paid in the first instance out of funds raised by long term securities — that is, corporate stock — I do not think that the taxpayers can be afforded relief in this way. This view, however, does not appear to me to apply to the $1,000,000 of special revenue bonds issued to meet such expenses for 1918. The debts of the city represented by those bonds have not yet been paid by taxation, but are to be paid by this year's tax levy. The learned justice at Special Term examined this question and concluded that under said section 10, as amended, the option given to the board to raise the funds to pay those expenses for 1918 had been exercised by the issue and sale of the special revenue bonds for that purpose; that the provision of the section requiring the bonds to be paid by means of the tax levy is imperative, and that no option or authority is left in the present board to undo the act of the board of the prior year and provide for the payment of the bonds out of the proceeds of corporate stock. While the reasoning of the learned justice upon this point does not appear to my mind

as conclusive as his reasoning upon the other, yet upon the whole it meets with my approval.

The entire scheme of the challenged resolution of the board is to adopt the policy of paying as far as possible these obligations of the city by the issuing of long term corporate stock as against the former " pay-as-you-go " policy, and to reverse that policy even as to past transactions and by so doing to abnormally reduce the present tax levy. If the authority to take that course existed in the board we would have nothing to do with the question of the propriety of the procedure, but it seems to me that the requisite authority is wanting.

The appellants further contend that this form of an action cannot be successfully maintained upon the facts here because there will be from the contemplated procedure no waste of or injury to the funds, property or estate of the city — that is to say, that the money to be raised is to be used to pay the city's obligations, and that there is no substantial detriment to the taxpayer if the one method be adopted rather than the other. This point also was considered by the justice at Special Term and disposed of upon the ground that the issuing of the long term securities would diminish the borrowing capacity of the city for the making of public improvements and also in the end increase the city's interest charge. This view also seems to be well sustained.

I advise, therefore, that the order appealed from be affirmed, with ten dollars costs and disbursements.

BLACKMAR, J., read for reversal, with whom JENKS, P. J., concurred, also adding separate memorandum.

PUTNAM, J.:

I agree that the purpose of the 1912 amendment of section 10 of the Rapid Transit Act was to provide for funding as " cost of construction " that portion of the expenses of the Public Service Commission which as the building work should go on the Commission should determine to be so included in the railroad cost under the future transit contracts. Obviously that apportionment of engineering and other overhead charges must be made by the Commission itself.

The word " determine " has a precise meaning. When used in such connection as this it is defined to mean: " To

fix or settle definitely; make specific or certain " (Century Dict.); " To regulate, to settle, to decide " (Webster Dict.). It here means an official ascertainment of the part of its expenses that forms or may form part of the cost — not of railway construction in general — but the part applicable to a particular subway to be built under sections 26, 27, 29 or 33 of the Rapid Transit Act.*  There are two such works going forward: Contract No. 3 by the Interborough Rapid Transit Company, and contract No. 4 by the New York Municipal Railway Corporation.  The engineering features of each differ in respect to work above ground, and excavation for river tunnels and under street beds.  Obviously the city's permanent debt cannot be extended by new corporate stock issues, to be charged against subway construction in bulk, but only against expenses forming part of the construction cost of *one* of the railroads being built under the act. And this is not only for funding purposes.  Such construction cost of each road, as ultimately ascertained, forms the basis of the quarterly rental payments to the city.  (Contracts, chap. 2, art. 49, subsections 9, 10.)  That no such approximation as was here reluctantly furnished is a determination of the Commission is further confirmed by a perusal of the contracts. For example, chapter V, article 29 of contract No. 4, states: " The cost of construction and cost of equipment shall be determined as follows: The Engineer shall within six (6) months after the date of the contract render a determination in writing in duplicate to the Commission and to the Lessee of the cost of construction and of the cost of equipment paid or accrued prior to the date of this contract.  In the case of all work done after the date of this contract the Engineer shall, on or about the first days of January, April, July and October, in each year during Construction or during the

---

* See Laws of 1891, chap. 4, § 26, added as § 34 by Laws of 1894, chap. 752, as renum. and amd. by Laws of 1909, chap. 498; Laws of 1910, chap. 205; Laws of 1912, chap. 226, and Laws of 1917, chap. 625; Id. § 27, added as § 34a by Laws of 1906, chap. 472, as renum. and amd. by Laws of 1909, chap. 498; Laws of 1910, chap. 504, and Laws of 1912, chap. 226; Id. § 29, added as § 34c by Laws of 1906, chap. 472, as renum. and amd. by Laws of 1909, chap. 498, and Laws of 1912, chap. 226; Id. § 33, added by Laws of 1909, chap. 498, as amd. by Laws of 1912, chap. 226.— [REP.

provision of Equipment (including the construction or provision of Additions to the Railroad or to the Equipment) render a determination in writing, in duplicate, to the Commission and to the Lessee of the cost of construction and of the cost of equipment, to the date of the last day of the preceding quarter, including therein separately a determination of the cost of construction and the cost of equipment during the quarter year immediately preceding the date of such determination. If either the Commission or the Lessee shall be dissatisfied with the determination of the cost of construction or cost of equipment * * * it shall within thirty (30) days after the receipt of any such determination file with the Engineer a statement in writing of the item or items objected to and the reasons for such objection. If within such period of thirty (30) days the Commission or the Lessee shall fail to file such statement with the Engineer, the determination shall be final and conclusive upon the party so failing."

Notwithstanding the provisions of the Rapid Transit Act, the record here shows that such a " determination " of the apportioned expenses applicable to cost of construction has not yet been made to the board of estimate and apportionment. The reluctance of the Public Service Commission to make such a finding appears not to have been from motives of concealment, but at the time because it seemed better to defer funding any part of its expenses, until it should be certain that the regular construction outlays would not exceed the debt limit of the city.

The situation of the city's financial officials on this matter most clearly appears from the comptroller's affidavit of February 17, 1919, as follows: " The Public Service Commission in its requisitions from time to time stated that more than 80 per cent of the moneys appropriated for its rapid transit expenses would be used for such expenditures as are included within the cost of construction as provided in the Contracts Nos. 3 and 4 and in the Rapid Transit Act. For more than a year past I have been endeavoring to procure definite information from the Public Service Commission as to the extent of such expenditures. Up to the present time this has not been received."

Instead of such information, which the secretary to the

Commission wrote could not be furnished " in the absence of the determinations and redeterminations of cost by the chief engineer pursuant to the contracts," the secretary sent a statement of the total expenses of the Commission " for administration, superintendence, legal expenses and engineering " applicable to these contracts 3 and 4, which is partly estimated. This is followed by his advice: " If a request is made upon the Commission to make the determination under the statute of the amount to be included in the Cost of Construction, it is suggested that the amounts specified above be taken at *not more* than the following amounts:

|  | Contract 3. | Contract 4. | Total. |
|---|---|---|---|
| 1915 ................. | $1,800,000 00 | $1,200,000 00 | $3,000,000 00 |
| 1916 ................. | 1,700,000 00 | 1,300,000 00 | 3,000,000 00 |
| 1917 ................. | 1,300,000 00 | 1,200,000 00 | 2,500,000 00 |
| Sum for three years..... | $4,800,000 00 | $3,700,000 00 | $8,500,000 00 " |

This way of estimating expenses by rough approximation in no respect is a compliance with the statute. The permanent interest-bearing debt of the city is not to be increased by salary, office, clerical and legal expenses of the Public Service Commission. Only a specific apportionment of the part of such outlays applicable to construction cost can make them a basis for being funded in city stock. The board of estimate and apportionment can only act under and in accordance with the statutory authority, in strict compliance with the provisions by which that power is limited and conditioned. (Dillon Mun. Corp. [5th ed.] § 883.) Whether this continued omission to determine and set apart the portion of such office expenses applicable to a certain railroad can hereafter be rectified, without further legislation, is not before us.

Upon this ground, that the Public Service Commission has not made the determination of the part of its expenses that may be legally funded as part of any subway construction cost, I concur to affirm the order.

KELLY, J.:

I agree with Mr. Justice BLACKMAR's first proposition, viz.: That the Rapid Transit Act, as amended in 1912, requires

that such part of the expenses of the Public Service Commission as went into the cost of construction of the dual system of subways should be paid from the proceeds of the sale of corporate stock and not from the general tax levy. I think this was the *obvious intention* of the Legislature in amending section 10 of the Rapid Transit Act by chapter 226 of the Laws of 1912. Prior to that amendment the cost of actual construction of the subways was not put upon the taxpayers in each year's levy. Such cost of actual construction was met by the issuance of corporate stock (Rapid Transit Act [Laws of 1891, chap. 4], § 37),* and the yearly contribution of the taxpayer was to the so-called overhead expenses of the Commission, such as superintendence, insurance, damages, emergency, legal expenses, etc. And I think the Public Service Commission has defined the *character* of expenditure chargeable to actual construction and to overhead expenses in the contracts. But for some reason it appears to have been hitherto impossible for the board of estimate to obtain from the Public Service Commission a legal determination or certificate separating the expenditures as to amount. So that the burden of the cost of actual construction is placed upon the taxpayers every year, which is, I think, contrary to the intention of the Legislature, imposing on them a burden which should be met by the issuance of securities running over a period of years. If the board of estimate had before it to-day the necessary legal determination, certificate or requisition from the Public Service Commission, separating the amount of the expenditures covered by the outstanding revenue bonds issued in 1918, I am not prepared to say that they are without authority to intervene and to relieve the taxpayers from this undue burden. But the difficulty which seems to bar the way is the failure of the Commission to comply with the law. The finances of the city cannot be administered and bond issues authorized on mere guess work and approximations which do not even purport to be binding or legal estimates. So that, commendable as are the intentions of the comptroller, I cannot see that there is any legal basis for his attempted division of the expenses of the Commission. That body has so far

* See *ante,* p. 194, and note.— [REP.

failed to make the necessary certificate or requisition, and I do not see how the board of estimate can make it. Upon these grounds, I vote to affirm the order.

Blackmar, J. (dissenting):

I think that the order should be reversed. My conclusion rests upon two propositions: *First*, that the Rapid Transit Act, as amended in 1912, requires that such part of the expenses of the Public Service Commission as went into the cost of construction of the dual system of subways should be paid from the proceeds of the sale of corporate stock, and not from the general tax levy; and, *second*, that the board of estimate and apportionment has power to correct the erroneous method of raising the funds to pay such expenses. If these two propositions are correct, it follows that the order enjoining action under the resolution of the board should not have been granted.

*First.* Prior to the enactment of chapter 226 of the Laws of 1912, the board of estimate and apportionment, the Public Service Commission, the Interborough Rapid Transit Company and the Brooklyn Union Elevated Railroad Company had, after long-continued negotiations, agreed upon the terms of contracts for the construction and operation of a comprehensive system of rapid transit known as the dual system of subways. At the session of the Legislature in 1912 the Rapid Transit Act was amended so as to authorize the making of these contracts already formulated. (See *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110.) This amendment is chapter 226 of the Laws of 1912.

Prior to this amendment all of the expenses of the Public Service Commission, incurred in the performance of its duties in regard to subway construction, were paid from the proceeds of revenue bonds issued in anticipation of the receipt of taxes. (Laws of 1891, chap. 4, § 10, as amd. by Laws of 1909, chap. 498.) The contracts, which the law of 1912 was enacted to authorize, provided that both the city and the railroad companies should contribute in agreed amounts to the cost of construction and that after certain preferential payments to the railroad companies the city should receive from the revenues of operation a percentage

on the amount contributed by it to the cost of construction sufficient to pay interest on any corporate stock issued to pay for the same and to furnish a sinking fund for its retirement. There was inserted in the contracts a clause which provided that the words " cost of construction " should include part of the expenses of the Public Service Commission, such as superintendence, insurance, damages, engineering and legal expenses. The effect of this clause was to give the city a larger participation in the revenues of the roads. It was to authorize contracts with such provisions that chapter 226 of the Laws of 1912 was passed.

As, therefore, the contracts provided that the city should receive an amount that was equivalent to interest on these expenses with a sinking fund for their retirement, it was reasonable and just that they should be paid from the avails of the sale of corporate stock, which would presumably be taken care of from the revenues of the roads. To accomplish this purpose section 10 of the act was amended by adding the following words: " If the said Commission shall determine that part of its expenses shall be included in determining the cost of construction of a railroad constructed under sections twenty-six, twenty-seven, twenty-nine or thirty-three of this act, then and in that event the said board of estimate and apportionment or other board or public body upon the requisition of the Commission duly made may appropriate such sum or sums of money as may be requisite and necessary for such part of its expenses and authorize the issue of corporate stock for such purposes, and it shall thereupon become the duty of the comptroller of said city to issue and sell corporate stock of the city for such purposes."

The " determination " by the Public Service Commission evidently, means the determination expressed in the terms of the contracts. The act speaks of a determination by the Commission that part of its expenses be included in determining the cost of construction. When the contracts were executed the Public Service Commission did determine that a part of its expenses should be included in determining the cost of construction. The regular proceedings under the act, therefore, should be, I think, as follows: The Public Service Commission should make requisition on the board of estimate

and apportionment for such portion of its expenses. This requisition, like any other budget or requisition of an executive department to form the basis of an appropriation by a legislative department, is necessarily made in advance of the expenses that are to be paid from the appropriation, and consequently is based on estimates. This is so from the necessity of the situation. It has always been the course under section 10 before the amendment of 1912 and is the course adopted under such amendment for the year 1919. The requisition is not the " determination." Upon such requisition the board of estimate and apportionment should make a proper appropriation and authorize the issue of the corporate stock. I think that the use of the word " may " does not import that the board of estimate and apportionment may elect whether to provide the funds by sale of corporate stock, or from the tax levy. The word " may " precedes the word " appropriate." Certainly it is not left to the discretion of the board to appropriate the moneys to carry out the contracts; and if the money is appropriated the authorization of the corporate stock necessarily follows. When the intent of the law that a certain act shall be done is obvious, the word " may " should be read " must." (*People ex rel. Conway* v. *Supervisors,* 68 N. Y. 114; *Hagadorn* v. *Raux,* 72 id. 583.) The principle is applied in cases where the public interest is concerned. (*Newburgh Turnpike Co.* v. *Miller,* 5 Johns. Ch. 101.)

If the issuance of the stock is to wait until the construction account, in so far as it includes these expenses, is settled between the railroads and the Public Service Commission, which may be years — in fact it appears that the adjustment has been reached up to the year 1915 only — from what source are these expenses to be paid as incurred? Nothing in the act justifies the position that they may be paid temporarily from the tax levy, for, as we have seen, it requires them to be paid from the avails of the sale of corporate stock.

It is easy to be led astray by the word " determine," used both in the act and in the contracts. The word is used twice in the act with obviously different meanings. The act reads: " If the said Commission shall *determine* that part of its expenses shall be included in *determining* the cost of con-

struction." The word as used the first time means the decision that part of the expenses of the Commission shall be so included; as used the second time, it means the adjustment of the amount. In neither case does it mean the requisition. The first determination, already made by the provisions of the contract, is a condition to the requisition, the appropriation and the issuance of the stock. The second determination, *i. e.*, the settlement of the amount of the cost of construction, may follow long afterwards. As a matter of fact, the requisition has already been made and the money appropriated. The requisition stated that eighty per cent thereof would be for cost of construction. This, I think, was sufficient to warrant the board in authorizing special revenue bonds for twenty per cent thereof and corporate stock for eighty per cent. If not sufficiently definite, the board could have required more particular specification. The authorization of special revenue bonds for the whole amount of the requisitions was unwarranted. The resolution enjoined now makes, in part at least, the separation and shifts the burden to the proper source.

The contracts have been signed, the determination made therein, and the provisions of the act for the payment of such expenses from the proceeds of the sale of corporate stock are, I think, mandatory. There is no reason why we should construe the act so as to permit the board of estimate and apportionment to impose on the taxpayers a financial burden for the discharge of which other provision has been made in the contracts. The reasonable construction of the act is that as in the contracts authorized by the act provision is made for the payment of the interest and principal upon corporate stock, such stock should be issued.

*Second.* If I am right in the first proposition, money to pay for that part of the expenses of the Commission included in the cost of construction, which should have been provided by the sale of corporate stock, for the payment of which, out of the revenues of the road, provision is made by the contracts, has been improperly exacted from the taxpayers through the medium of special revenue bonds covered into the general tax levy. The power to issue corporate stock to meet such expenses was conferred by section 10 of the

act. That power is not impaired by the unwarranted action of the board in issuing special revenue bonds. The conditions to the exercise of the power still exist. The determination of the Commission that a part of the expenses shall be included in determining the cost of construction has been made in the contracts, a sufficient requisition by the Commission has been made, the sum has been appropriated, and the duty to issue the corporate stock follows. A resolution to perform that duty is not an " illegal official act." The argument that corporate stock cannot be issued to furnish funds for the current operating expenses of the city government or to redeem special revenue bonds, although accurate as an abstract proposition of law, is superficial and does not reach the question. The real purpose of issuing the stock is not to meet current expenses, or to retire special revenue bonds, although it has that incidental effect, but to pay for the cost of construction; and that is what it really does. The general fund has been improperly depleted and no reason exists why it may not be made good by money derived from the proper source.

If the board of estimate and apportionment have the discretion whether to pay these expenses from taxes or from the avails of corporate stock, the conclusion reached by the learned justice who decided the motion is supported by authority and is palpably correct; but such is not my reading of the act.

I cannot refrain from saying that in my opinion the difficult question is whether the board of estimate and apportionment can correct their erroneous method of raising funds without special authority from the Legislature. My judgment is that it can be done.

The conclusion arrived at renders unnecessary the examination of the question whether a taxpayer's action lies in this case.

The order should be reversed and the motion denied.

JENKS, P. J., concurred.

JENKS, P. J.:

I am of the same opinion as BLACKMAR, J. To me, his reasoning seems cogent and correct. Believing that he is

correct in his application of the law, I add but a few words to show my view of this controversy.

The condition that confronts the board of estimate and apportionment is that special revenue bonds and revenue bonds outstanding were issued whereby funds were provided to meet certain obligations. As such bonds are charged by law upon the tax levies, it follows that the funds were provided by the tax levies. This financing under the circumstances of this case is against the law.

The board of estimate now furnishes funds by the issue of corporate stock, which is the means provided by law. And the law provides that this corporate stock shall be discharged, not by the tax levies, but presumptively by a sinking fund made by the moneys received by the city from the revenues of the railroads. In this instance, part of the proceeds of the sale of such corporate stock is devoted to meet the said special revenue bonds, which otherwise (if not refunded into revenue bonds) must be met by the next ensuing tax levy, and part of the said proceeds of the sale of such corporate stock is to be paid into the general fund for the reduction of taxation in order to offset the revenue bonds which are a charge upon the tax levies. Thus in effect the tax levies are relieved from any depletion by the special revenue bonds and the said revenue bonds.

The previous scheme, which in effect resorted to the tax levies (inasmuch as the special revenue bonds and the revenue bonds must be met therefrom), cannot be recognized as financing to provide the *final funds* to meet the obligation in question, for, as I have said, the law forbade resort to the tax levies; but that scheme may be regarded as a method whereby funds were *advanced* or *borrowed,* so to speak (whether legally or not, it is not necessary to decide), on the security of the tax levies, evidenced by the said special revenue bonds and the said revenue bonds. And the present action of the board of estimate may be regarded as proper financing in this matter of an existing obligation whereby lawful ways and means replace this advance or this loan by moneys raised from a source which the law prescribed shall afford the final payment, namely, the sinking fund made by the revenues received from the railroads.

And so this present action need not be considered as of the taking of one lawful way of raising the final funds in substitution for another lawful way heretofore taken, since the present action is the sole lawful way.   It is not selection, but correction.

In the absence of this action the tax levies remain charged contrary to law.   The wrong to the taxpayer, if any, would be in diversion of the tax levies to provide the *final payment* of these obligations, when the law declares that such payment must be met by funds furnished from another source, not taxation, but revenues received from the railroads.

Order affirmed, with ten dollars costs and disbursements.